TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Sr. José Saéz Navarro, Aida Ruth Martínez y Bayxel Sáez para solicitar que revoquemos una sentencia emitida por el Tribunal de Primera Instancia, Sala de San Juan, el 26 de junio de 2009 en la que dicho foro desestimó con perjuicio por la vía sumaria la causa de acción contra el Banco Santander de Puerto Rico.
Por los fundamentos que a continuación expondremos, se confirma la sentencia parcial apelada.
I
Hechos
El 10 de junio de 2006, el codemandante Bayxel Sáez ejerció una opción de compra para el apartamento 806 del Condominio Torres de Andalucía en Río Piedras. La referida opción se hizo a través de los corredores de bienes raíces, la codemandada Marsters Real Estate y de su vendedor el señor Rafael Maldonado. Según surge del contrato de opción de compraventa, quedó establecido que éste tendría una vigencia de 60 días, es decir hasta el 9 de agosto de 2006. Como parte del contrato de opción, Sáez entregó a Marsters Real Estate la suma de $2,000 en concepto de depósito.
Sáez comenzó a efectuar los trámites con el Banco Santander Mortgage Corp. (Santander), a través de su *893 representante el Sr. Carlos Rivera, para obtener el financiamiento de la propiedad opcionada. Luego de evaluar el caso del codemandante Saéz, el banco le informó que para poder concederle el préstamo, necesitaba conseguir un codeudor. A esos fines, Santander solicitó información sobre los ingresos de los padres de Sáez, los codemandantes Aida Ruth Martínez y José Sáez Navarro (los esposos Sáez-Martínez).
Como parte de los trámites para la aprobación del préstamo hipotecario, Santander, a su vez, contrató los servicios de la compañía codemandada ACRES Appraisal Consulting & Real Estate Services quien, a través de la tasadora, la codemandada Carmen L. Torres, preparó un informe titulado “Appraisal of Real Property”.
Una vez sometida toda la documentación necesaria, el 27 de julio de 2009, Santander envió una carta a Sáez para informarle que su préstamo había sido aprobado y le solicitó que se comunicara con el banco para coordinar una fecha para el cierre y firma de las escrituras. Así pues, el 31 de julio de 2003, los codemandantes acudieron a las oficinas del referido banco para otorgar la escritura de compraventa e hipoteca de la propiedad opcionada. Según alegan los demandantes fue en ese momento que se percataron que los esposos Sáez-Martínez aparecían en las escrituras como compradores del 50% de la propiedad y como deudores principales en el préstamo hipotecario. Ante esta situación, el Sr. Rivera, representante de Santander, les informó que si se arrepentían y no firmaban las escrituras, su hijo perdería el depósito pagado. En vista de que los esposos Sáez-Martínez no habían visto el apartamento, solicitaron permiso para verlo, pero tanto el Sr. Rivera como el Sr. Maldonado, corredor de bienes raíces, le indicaron que no era posible. Alegan los demandantes-apelantes que, ante la preocupación de los esposos Sáez-Martínez respecto a las condiciones físicas del apartamento, el Ledo. Marrero —notario público ante quien se otorgaron las escrituras — , consultó con el Sr. Rivera y con el Sr. Maldonado, a lo que ambos aseguraron que todo estaba en orden. Así pues, los demandantes accedieron a firmar las escrituras, no sin antes hacer la salvedad de que si la propiedad no estaba en condiciones apropiadas, resolverían el negocio de compraventa.
Posteriormente, cuando los esposos Sáez-Martínez tuvieron acceso a la propiedad, se percataron de que ésta se encontraba en pésimas condiciones y que dentro de la misma había más de 15 cajas llenas de escombros y basura, entre otras cosas. Ante tal situación, los demandantes contrataron los servicios de la firma ambiental CMC Environmental Consultants para una evaluación de la propiedad. El informe preparado por dicha firma reveló la presencia de asbesto en los techos, y plomo en las losas y en la pintura de las paredes de la propiedad del codemandante Sáez.
Así las cosas, el 13 de marzo de 2007, los apelantes presentaron una demanda sobre nulidad de contratos, rescisión y daños y perjuicios contra Acres-Appraisal Consulting & Real Estate Services, Carmen L. Torres, Marsters Real Estate, Rafael Maldonado, Banco Santander y/o Santander Mortgage Corp., entre otros. [1] En la misma, solicitaron la nulidad de los contratos de compraventa e hipoteca por vicio en el consentimiento, así como los daños y perjuicios sufridos a causa de los alegados actos negligentes de los demandados. En síntesis, alegaron que el apartamento adquirido estaba en pésimas condiciones de infraestructura; que contrataron los servicios de una firma ambiental para que recogiera muestras de la propiedad; que el informe rendido por dicha firma reflejó la presencia de plomo y asbesto en el apartamento; y que si hubieran sido informados sobre tal situación, no hubieran firmado las escrituras de compraventa e hipoteca. Señalaron que el consentimiento estuvo viciado al desconocer los defectos del apartamento.
En cuanto a la parte codemandada-apelada, el Banco Santander, la parte demandante-apelante específicamente indicó que ninguno de los representantes de dicha entidad bancaria le explicó que los codemandados Sáez-Martínez comparecerían en la escritura de compraventa como compradores del 50% de la propiedad, así como tampoco le informaron cuáles serían las implicaciones de éstos servir como codeudores en el negocio de compraventa. Añadió que al referido banco se le puede imputar el conocimiento que tenían los vendedores demandados sobre la existencia de contaminantes peligrosos en la propiedad. Finalmente, aseguró que no hubiesen comprado la propiedad si los codemandados le hubiesen advertido sobre la presencia de plomo y *894 asbesto en ésta.
La parte demandada-apelada contestó la demanda negando que tuviese alguna responsabilidad por lo acontecido y presentó varias defensas afirmativas. Luego de enmendada y contestada dicha enmienda, Santander presentó una solicitud de sentencia sumaria, a la cual se opuso la parte demandante-apelante. En la misma, Santander argumentó que para efectos de la Regla de Divulgación —aprobada de conformidad con el estatuto “Residencial Lead-Paint Hazard Reduction Act” del Título 24 del Código de Regulaciones Federales (CFR) — , la responsabilidad de divulgar información relacionada con la posible existencia de plomo y asbesto en las residencias construidas antes de 1978 y los riesgos que la misma conlleva, le corresponde al vendedor, al arrendatario o al agente de cualquiera de éstos. Añadió que ni Santander Mortgage ni Banco Santander de P.R pueden considerarse como agentes a los efectos de imponerle responsabilidad alguna bajo las leyes federales, toda vez que ninguna de estas compañías contrató con los vendedores para representarlos en el negocio de compraventa de la propiedad en controversia. Indicó, a su vez, que la omisión en brindar tal información tampoco es motivo para anular las escrituras de compraventa e hipoteca. Además, señaló que no se le puede imputar conocimiento alguno al banco, debido a que su participación en el negocio de compraventa se limitó a brindar el financiamiento para la adquisición de la propiedad. Finalmente, indicó que, de los documentos incluidos con su moción de sentencia sumaria, surgía que Santander no tuvo la relación contractual requerida para que proceda la rescisión de los contratos, como tampoco intervino en los hechos que provocaron la controversia de autos.
El 26 de junio de 2009, el TPI emitió la sentencia parcial apelada en la que desestimó con perjuicio la causa de acción en contra del Banco Santander de Puerto Rico de manera sumaria. Como fundamento a su determinación, indicó lo siguiente:
“(1) La legislación federal (Residencial Lead-Based Saint Hazard Reduction Act) no le impone a los bancos obligación alguna de advertir a los compradores sobre los posibles peligros de la presencia de plomo en las viviendas constmidas antes del 1978. Así lo intimamos en nuestra Resolución de 18 de junio de 2008 y así lo ha resuelto la Corte Federal para el Distrito de Puerto Rico en el Caso Civil 08-1604 CCC (José Sáez Navarro v. Banco Santander) al emitir el 21 de mayo de 2009 una Sentencia Parcial en la que desestimó la demanda en cuanto a Santander.
(2) La reglamentación del Departamento de Vivienda Federal (HUD) a la que alude la demandante debe ser de aplicación a préstamos asegurados por la FHA. El préstamo que se otorgó en este caso era uno convencional, y no tenía garantía federal.
(3) Cualquier reclamación basada en error o dolo contractual no puede atenderse en este caso porque el remedio sería la nulidad del contrato de compraventa y la devolución de las contraprestaciones. Habiéndose desistido con perjuicio de la demanda en cuanto a los vendedores, no es posible hacer una determinación sobre consentimiento viciado por dolo o error.
(4) No encontramos base para concluir que los bancos e instituciones análogas tengan la obligación de velar, en circunstancias como éstas, por el bienestar de los consumidores haciéndoles este tipo de advertencia. El hecho de que estas entidades conozcan un sinnúmero de leyes y reglamentos federales no significa que éstas tengan la obligación de asesorar a sus clientes sobre las mismas, salvo que la ley así lo requiera. No estamos en uno de esos casos. No puede imponérsele a Santander responsabilidad bajo el Art. 1802 del Código Civil. Págs. 212-213 del apéndice del recurso.”
Oportunamente, los demandantes-apelantes presentaron una moción de reconsideración la cual, aunque fue acogida por el TPI, fue posteriormente denegada, el 10 de agosto de 2009.
Inconforme con dicha determinación, los demandantes acuden ante nos mediante el presente recurso en el *895 que alegan que erró el TPI al:
“1. Dictar sentencia sumaria a favor del demandado-apelado Santander, contrario a la normativa vigente en tomo a solicitudes de sentencia sumaria; y obviando que la parte demandante estableció que legítimamente existen controversias de hechos en tomo a las reclamaciones en contra del demandado-apelado Santander, que ameritan ser resueltas en una vista en su fondo.
2. Determinar que el Derecho aplicable no le asiste a la parte demandante-apelante en tomo a su reclamación en contra del demandado-apelado Santander; y erró al no determinar que el demandado-apelado Santander actuó de forma culposa, negligente y dolosa y que con sus actuaciones le produjo daños y perjuicios a los demandantes-apelantes.”
n
Derecho Aplicable
Para un mejor entendimiento del derecho aplicable y de manera persuasiva, citamos in extenso de la Opinión Concurrente del Juez Rebollo López respecto a los requisitos establecidos en el “Residencial Lead-Paint Hazard Reduction Act” y en la Regla de Divulgación (“Disclosure Rule”), en In re: Coldberg Trigo, 169 D.P.R. 107, 122-132 (2006).
De particular relevancia al presente caso resulta ser la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales, “Residential Lead-based Paint Hazard Act”, 42 U.S.C. § 4851 et seq. Dicho estatuto fue aprobado en el 1992 por el Congreso de los Estados Unidos en respuesta a varios hallazgos sobre los efectos nocivos del plomo en el ser humano, particularmente, en los niños menores de seis años. 42 U.S.C. § 4851. Véase, Mason v. Morrisette, 403 F.3d 28, 30 (1st. Cir. 2005); National Multi Housing Council v. United States Environmental Protection Agency, 292 f 3d. 232, 233 (D.C. Cir. 2002); Sweet v. Sheahan, 235 F.3d 80, 83-84, (2nd. Cir. 2000). (Citas omitidas.)
La referida pieza legislativa se aprobó, entre otras, con la intención de establecer la infraestructura necesaria para reducir rápidamente los peligros de la pintura a base de plomo en las residencias y para enfrentar la necesidad de controlar la exposición de los ciudadanos a estos peligros. 42 U.S.C. § 4851a(l); Mason v. Morrisette, ante, a la pág. 30; Sweet v. Sheahan, ante, a la pág. 84. Se aprobó, además, con el objetivo de educar al público sobre los peligros y orígenes del envenenamiento por la pintura a base de plomo y sobre los pasos para poder reducir y eliminar estos riesgos. 42 U.S.C. § 4852a(7); Mason v. Morrisette, ante, a la pág. 30.
Específicamente, se dispuso que las residencias o viviendas objeto de la legislación, “target housing”, eran, como regla general, aquellas propiedades construidas antes de 1978. 2 U.S.C. § 4851b(27); 24 CFR § 35.86; 40 CFR § 745.103. Ello en vista de que ese fue el año en que la Comisión para la Seguridad de los Productos de Consumo, Consumer Product Safety Commission, prohibió el uso de la pintura a base de plomo. National Multi Housing Council v. United States Environmental Protection Agency, 292 f 3d. 232, 233 (D.C. Cir. 2002); (Citas omitidas.) (Subrayado en el original.)
De otra parte, se excluyeron de la aplicación de esta legislación: (1) viviendas para personas de edad avanzada (a menos que resida o se espere resida un niño menor de 6 años); (2) viviendas para incapacitados; (3) viviendas de 0 cuatros; y (4) alojamiento comercial. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9066. (Citas omitidas.)
Para lograr los objetivos de esta medida, se requirió, en lo aquí pertinente, que la EPA y HUD promulgaran una regulación conjunta para asegurar que los compradores y arrendatarios de viviendas objeto de la legislación estuvieran recibiendo toda la información necesaria para proteger a su familias de los peligros de la pintura a base *896 de plomo. 42 U.S.C. § 4852d(a)(l); Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9064. (Citas omitidas.)
Ahora bien, y no obstante haber requerido lo anterior de las referidas agencias, mediante el mencionado estatuto el Congreso estableció unos parámetros con respecto a qué tipo de información obligatoriamente tenía que ser divulgada a todo comprador o arrendatario de una propiedad construida antes de 1978 antes de que estuviera contractualmente obligado por un contrato de compraventa o arrendamiento. A esos efectos, se exigió que los vendedores y arrendadores les proveyeran a éstos un folleto informativo preparado por la EPA sobre los peligros del plomo y Ies divulgaran su conocimiento sobre la presencia de pintura a base de plomo o de sus peligros en la propiedad, proveyéndoles cualquier informe o evaluación que tuvieran disponible. 42 U.S.C. § 4852d(a)(l). Particularmente, a los vendedores de dichas propiedades se les requirió que le proveyeran a los prospectos compradores un período de 10 días —o aquel período que mutuamente acordaran— para que tuvieran la oportunidad de realizar una inspección o evaluación para la detección de los peligros de la presencia de pintura a base de plomo en la residencia objeto de venta. 42 U.S.C. § 4852d(a)(l). (Énfasis nuestro.)
Es preciso señalar que el vendedor tiene que cumplir con lo anterior, antes de aceptar la oferta del prospecto comprador, ello con el propósito de que el prospecto comprador tenga la oportunidad de revisar la información y posiblemente enmendar la oferta. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9071. De este modo, se le notifica al prospecto comprador sobre la posibilidad de que estén presentes en la propiedad los riesgos de la pintura a base de plomo, ofreciéndole la oportunidad para rechazar la transacción o para proceder a realizar el contrato de compraventa con el conocimiento de que existe la posibilidad de que dichos peligros pueden estar presentes en la propiedad que va a adquirir. Mason v. Morrisette, ante, a la pág. 31. (Énfasis nuestro.)
Es de notar que a los agentes de los vendedores y arrendadores se les impuso, a su vez, la responsabilidad de asegurarse de que sus clientes cumplieran con los requisitos de divulgación y notificación establecidos por la ley. 42 U.S.C. § 4852d(a)(4). Los agentes pueden cumplir con esta obligación informando a los vendedores o arrendadores de sus obligaciones y asegurándose que las actividades son completadas ya sea por el vendedor o arrendador o llevándolas a cabo personalmente. Luego de que el agente ha informado al vendedor o arrendador de sus obligaciones de divulgación bajo dicho estatuto, el agente no será responsable por aquella información que el vendedor o arrendador le haya escondido. 24 CFR § 35.94; 40 CFR § 745.115; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9077. (Citas omitidas.) (Énfasis nuestro.)
De otra parte, mediante el mencionado estatuto se exigió que todo contrato de compraventa incluyera un anejo constatando que se cumplieron con los antes mencionados requisitos de divulgación. A tales efectos, específicamente, se requirió que en una hoja de papel aparte —en letra grande y en el mismo idioma del contrato— se incluyera una Declaración de Advertencia de Pintura a Base de Plomo, “Lead Warning Statement”. Asimismo, se requirió que dichos contratos incluyeran una aseveración del comprador certificando que había leído la referida declaración, que había recibido el panfleto de la EPA y que tuvo la oportunidad de realizar una inspección a la propiedad antes de estar contractualmente obligado con el vendedor. 42 U.S.C. § 4852d(a)(2); Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9064-9065. (Citas omitidas.) (Subrayado en el original.)
En específico, se establecieron, además, penalidades y sanciones significativas por incumplir con los requisitos de divulgación y notificación de la mencionada pieza legislativa. Mason v. Morrisette, ante, a la pág. 31. (Citas omitidas.). A tales efectos, se autorizó a la EPA y a HUD a imponer penalidades monetarias civiles por cada violación a la Ley. Más aún, se dispuso que todo vendedor o arrendador que, a sabiendas, violara las disposiciones de esta Ley resultaría responsable civilmente por hasta el triple de la cuantía de los daños causados al comprador, más las costas y honorarios de abogado. 24 CFR § 35.96; 40 CFR § 745.118; Lead; Requirements *897 for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9065. Ahora bien, expresamente se dispuso que el incumplimiento con las disposiciones de la ley no autorizaba a la rescisión del contrato o a la creación de un defecto en el título de la propiedad. 24 CFR § 35.98; 40 CFR § 745.119; (Subrayado en el original.) (Énfasis nuestro.)
Así pues, en virtud del antes mencionado mandato y conforme a los parámetros establecido por dicho estatuto, en 1996, la EPA y HUD aprobaron sus regulaciones conjuntas, mejor conocidas como la Regla de la Divulgación, “Disclosure Rule”. 24 CFR § 35, según codificado por HUD Y 40 CFR § 745, según codificada por la EPA. Mediante la referida Regla se dispuso específicamente qué información debía ser divulgada y cuál era el lenguaje que todo contrato de compraventa debía contener a esos efectos. De esta forma, se impuso la obligación se certificar y acreditar que se cumplieron con los requisitos de divulgación impuestos por el antes mencionado estatuto.
De este modo, se requirió que todo contrato de compraventa de una propiedad construida antes de 1978 incluyera en el idioma del contrato un documento anejado con los siguientes elementos: (1) la Declaración de Advertencia de Plomo, “Lead Warning Statement”; (2) una aseveración del vendedor divulgando su conocimiento sobre la presencia de pintura a base de plomo y/o de sus peligros en la vivienda o indicando su desconocimiento de la presencia de éstos; (3) una aseveración del vendedor de que ha entregado al comprador una lista de los informes o evaluaciones que tiene disponibles o indicando que no los tiene; (4) un acuse de recibo del comprador afirmando que ha recibido toda la información antes mencionada y el folleto informativo de la EPA sobre los peligros del plomo; (5) una aseveración del comprador de que tuvo un período de 10 días (o el período acordado entre las partes) para realizar una evaluación o inspección de los peligros de la pintura a base de plomo en la propiedad o, en la alternativa, una aseveración de que ha renunciado a su derecho de realizar la misma; (6) cuando hay un agente envuelto en la transacción tiene que incluirse una afirmación de que éste le informó al vendedor su obligación de cumplir con la regla de divulgación y que está consciente de su deber de asegurarse del cumplimiento con los requerimientos de esta regla; (7) por último, debe incluirse la fecha y la firma del vendedor, agente, y el comprador certificando la exactitud de las aseveraciones en el anejo. 24 CFR § 35.92; 40 CFR § 745.113; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9072-9073. (Citas omitidas.) (Subrayado en el original.) (Énfasis nuestro.)
Por último, las referidas agencias le impusieron la obligación al vendedor, y al agente, de retener copia de este documento por un período no menor de tres años desde la fecha de la venta de la propiedad. 24 CFR § 35.92; 40 CFR § 745.113; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9076. (Citas omitidas.) (Énfasis nuestro.)
Coincidimos con el tribunal apelado en cuanto a que la legislación federal aquí citada no le impone a los bancos obligación alguna de advertir a los compradores de viviendas construidas antes del 1978 sobre los posibles peligros de la presencia de plomo en dichas propiedades. La ley federal es bien clara en cuanto a que dicha obligación recae específicamente sobre los vendedores y arrendadores y los agentes de éstos. AI igual que el TPI, entendemos que el hecho de que las entidades bancadas conozcan de un sinnúmero de leyes y reglamentos federales no significa que estén obligadas a asesorar a sus clientes sobre las mismas.
Dado lo antes expuesto y por no haber controversia de hecho en cuanto a que el “Residencial Lead-Based Paint Hazard Reduction Act” no le impone a los bancos obligación alguna de advertir a los compradores sobre la posible presencia de plomo en las viviendas construidas antes del 1978, concluimos que no erró el tribunal a quo al desestimar la causa de acción contra la parte apelada de manera sumaria.
Como se sabe, la sentencia sumaria gobernada por la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, constituye un mecanismo procesal discrecional y extraordinario cuyo propósito es facilitar la solución *898 justa, rápida y económica de aquellos litigios civiles que no presenten controversias genuinas de hechos importantes y pertinentes que la regla llama “materiales”; razón por la cual no ameritan la celebración de un juicio en su fondo y pueden adjudicarse implementando la norma de ley referente a hechos no disputados. Quest Diagnostic v. Mun. San Juan, 175 D.P.R._(2009), 2009 J.T.S. 80; Cruz González v. Pep Boys, 169 D.P.R. 829 (2007); Freire Ayala v. Vista Rent, 169 D.P.R. 418 (2006); Pilot Life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624(1994).
Es reiterada la doctrina al efecto de que mediante dicho mecanismo se busca obtener un remedio eficaz en casos en que queda demostrado que sólo es menester adjudicar el derecho sobre hechos importantes y pertinentes, que ya no están en litigio. PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881, 911-912 (1994); Revlon v. Las Américas Trust Co., 135 D.P.R. 363, 376 (1994).
Cualquier duda sobre la existencia de una controversia de hechos pertinentes y materiales debe ser resuelta contra la parte que solicita la sentencia sumaria. Mgmt. Adm. Service Corp. v. E.L.A., 152 D.P.R. 599 (2000). Finalmente, cabe señalar que no se debe utilizar este mecanismo en casos muy complejos o que involucren el interés público. González v. Hosp. Pavía, 168 D.P.R._(2006), 2006 J.T.S. 107.
En resumen, concluimos que ante la situación particular que se informa en autos, el TPI efectuó una correcta aplicación de la Regla 36 de Procedimiento Civil, supra, al disponer sumariamente de la causa de acción en contra de la apelada. No encontramos pasión, prejuicio, parcialidad o error manifiesto en tal determinación, a la que brindamos deferencia. Ramos Milano v. Wal-Mart, 168 D.P.R. 112 (2006). En virtud de la reiterada doctrina, resulta imposible validar la contención de la parte apelante, al efecto de que se cometieron los errores levantados.
ni
Dictamen
Por los fundamentos antes expuestos, confirmamos la sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIO 2010 DTA 34

. Para junio de 2009, las reclamaciones ante la consideración del TPI eran en contra del apelado, Banco Santander de P.R. y Marsters Real Estate.